THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILBERT F. DANIEL, Defendant-Appellant.

Second District    No. 2—98—0786

Opinion filed February 3, 2000.—Rehearing denied February 25, 2000.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and Richard S. London, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RAPP delivered the opinion of the court:

In July 1997, a jury convicted defendant, Wilbert Daniel, of two counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1), (a)(4) (West 1994)) and one count each of aggravated robbery (720 ILCS 5/18—5 (West 1994)), unlawful restraint (720 ILCS 5/10—3 (West 1994)), and criminal sexual assault (720 ILCS 5/12—13 (West 1994)). Defendant was sentenced in March 1998 to consecutive 11-year and 4-year prison terms and a concurrent 2-year prison term. Defendant appeals (see 134 Ill. 2d Rs. 602, 603; 188 Ill. 2d R. 606), arguing (1) that he was not proved guilty of the offenses beyond a reasonable doubt; (2) that, even if he was proved guilty of some of the offenses, the State nevertheless failed to prove the element necessary to enhance criminal sexual assault to aggravated criminal sexual assault; (3) that the trial court erroneously sentenced him under the mandatory consecutive sentencing provision of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5—8—4(a) (West 1994)); (4) that he is entitled to a new sentencing hearing because the trial court erroneously awarded him more sentence credit than authorized; and (5) that his conviction for unlawful restraint must be vacated because it was not

charged independently of the sexual assault allegations. We affirm in part, vacate in part, and remand with directions.

## I. FACTS

Defendant was charged in a five-count indictment with the October 1995 sexual assault and robbery of M.M. Counts I and II of the indictment charged defendant with aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1), (a)(4) (West 1994)); count III charged defendant with aggravated robbery (720 ILCS 5/18—5 (West 1994)); count IV charged defendant with unlawful restraint (720 ILCS 5/10—3 (West 1994)); and count V charged defendant with criminal sexual assault (720 ILCS 5/12—13 (West 1994)).

At defendant's trial, the jury heard testimony from various witnesses, including M.M. and defendant. M.M. testified that on October 13, 1995, her boyfriend, James Brunner, was working at the Lose Marathon station in Elgin, Illinois. As was her routine, M.M. went to the station that evening to visit Brunner. It was just after 9 p.m. Upon M.M.'s arrival, she agreed to get dinner for Brunner and another employee, Alan Rodriguez, at a nearby McDonald's restaurant.

According to M.M., while she was waiting in the drive-through lane of McDonald's, defendant approached her and asked for a ride because it was raining and he needed to get home to his young son. M.M. initially refused. However, after defendant persisted, M.M. relented and invited defendant into her car. M.M. drove defendant to the location he indicated and pulled to the curb to let defendant out. M.M. testified that once the car was stopped defendant thanked her for the ride, opened the car door, and began to exit. When defendant was halfway out of the car, he suddenly reached into the backseat, grabbed M.M.'s backpack, which she used as a purse, and stated, "Now, I'm going to rip you off." M.M. told defendant that she had no money, but defendant insisted that she did. Defendant got back in the car and ordered M.M. to turn off the car's engine and lights. An argument ensued, during which defendant allegedly showed M.M. a cocaine pipe and a white paper bag. Defendant also reached down by his feet and told M.M. that he had a pistol and he needed the money to buy cocaine. M.M. testified, however, that she never saw the gun but felt threatened by defendant's statement.

M.M. informed the jury that after the threat she told defendant that her boyfriend worked at the nearby Marathon station and she could probably get some money from him. Defendant allegedly asked M.M. if she valued her life and told her that she would have to do something for "collateral" so she wouldn't try to escape. M.M. thought defendant wanted her car and told him that he could not have it. De-

fendant replied that he did not want the car and then ordered M.M. to take off her pants and underwear. M.M. initially refused and started to reach for the door handle. Defendant told M.M. that if she tried to run he would shoot her in the back. M.M. gave in to defendant's demands and took off her pants and underwear and threw them in the backseat. M.M. testified that she complied with defendant's demand because defendant told her that he had a gun and she was afraid.

M.M. testified that after she was naked from the waist down, defendant told her to move over next to him and turn over on her stomach. M.M. tried to resist until defendant made a motion toward where he claimed the gun was located. M.M. then complied with defendant's order to "put this dick in you." Defendant had intercourse with M.M. M.M. did not yell out because "there was no one to yell out to." During the encounter defendant did not use any physical force. After defendant finished he sat back on the seat, and M.M. returned to the driver's seat. Defendant did not let M.M. get dressed, but instead had her drive to the Marathon station without wearing pants or underwear in order to get "his" money.

Upon arriving at the station M.M. and defendant encountered Brunner, Rodriguez, and Greg Irish, a friend of both M.M. and Brunner. Brunner approached the car and M.M. told him that she needed $60. Rodriguez and Irish remained near the door of the station. Brunner tried to give the money to defendant but defendant told Brunner to give it to M.M. instead. As Brunner complied with defendant's demand, M.M. attempted to mouth to Brunner that defendant had raped her.

Defendant took the money from M.M. and ordered her to drive away. M.M. testified that she obeyed defendant because she did not want him to hurt Brunner or her. M.M. further testified that, while they were driving, defendant said "that he was sorry he had to rape [her], and [she] better not call the police, because he knows where [her] boyfriend works now and he will kill him." M.M. dropped defendant off a few blocks from the station.

M.M. then returned to the Marathon station, parked, got dressed, and "just sat there." Shortly thereafter, Mike McGraw, another friend of Brunner and M.M., got into the car and asked M.M. if she was okay. M.M. responded that she had just been raped. As M.M. and McGraw were talking, the police arrived, and a short time later Brunner showed up. The police transported M.M. to the hospital, where she told her story to various police and hospital personnel. A physical examination revealed no trauma to M.M.

Several days after the incident, M.M. gave a taped statement to detectives in which she insisted that defendant entered her car without

permission. However, in January 1996, M.M. recanted and instead admitted that she had invited defendant into the car. M.M. indicated that she initially lied because she did not want her family and friends to know that she voluntarily allowed a stranger into her car.

Much of M.M.'s testimony regarding events that transpired at the Marathon station was corroborated through the testimony of Rodriguez, Irish, McGraw, and Brunner. Only Brunner's testimony warrants discussion.

Brunner told the jury that, when M.M. returned to the station after going to McDonald's, there was a black man in her car. When Brunner approached the car, he observed that the man's pants were unfastened and that M.M. was naked from the waist down and her clothes were in the backseat. Brunner also noticed that M.M.'s makeup was smeared and she appeared frightened but was not crying. Brunner did not see a weapon. Brunner testified that he was confused by what was happening, particularly when defendant demanded $60 from him. When Brunner attempted to give the money to defendant, defendant ordered him to give the money to M.M. instead. Defendant's hands were concealed between his legs. Brunner complied with the orders because he was frightened at M.M.'s actions and concerned for her safety. Once Brunner handed M.M. the money, M.M. pulled away from the station at a normal rate of speed. Brunner then got in his car and chased after M.M. and defendant.

Defendant testified on his own behalf. He told the jury that on the evening in question he went to McDonald's to get dinner. He had a little over $8 but was not carrying a pipe, a gun, or a white paper bag. According to defendant, as he was leaving McDonald's with his food, M.M. waived him over to her car and asked if he wanted a ride. Defendant claimed that he said "no" and that he was only going a couple blocks up the street. Defendant then claimed that M.M. asked if he was willing to help her get even with her boyfriend. According to defendant, he did not know what was going on but was interested nonetheless. M.M. then allegedly invited defendant into her car and defendant accepted the offer. Defendant walked around the front of the car, and got in. M.M. introduced herself and shook defendant's hand.

As they left McDonald's, M.M. again told defendant that she wanted to get back at her boyfriend. Defendant then told the jury that, without direction from him, M.M. drove to the corner of Liberty and Grand and parked the car. Once parked, M.M. allegedly again asked defendant for his help. He responded, "I don't know. I don't want to get into any trouble." M.M. then offered to pay defendant for his assistance. Interested, defendant began arguing with M.M. over the amount of money she would pay him despite not knowing what

exactly he would be paid to do. During the argument, M.M. allegedly mentioned that, while she did not have any money, her boyfriend worked at Marathon and she could get money from him. According to defendant, when he realized that M.M. had no money he said "forget it" and began to exit the car. M.M. then grabbed the back of defendant's jacket, pointed to a couple standing on a porch of a nearby house, and told him that if he left she would yell "rape."

Defendant testified that the couple came off their porch and down their driveway. The couple looked at defendant. Fearing they were members of M.M.'s family, defendant reentered the car and closed the door. Defendant stated that he watched the couple for a short time. When they returned to their house, defendant looked over at M.M. and discovered that she had removed her pants and underwear and thrown them in the backseat. M.M. then allegedly moved closer to defendant and began fondling his penis through his pants until it was erect. According to defendant, M.M. then unzipped his pants and proceeded to have intercourse with him. M.M. allegedly offered no resistence or objection but instead instigated the sexual encounter. Defendant denied ever telling M.M. that he had a gun, threatening her in any way, or telling her that he needed money for cocaine. Defendant also denied that he used the word "collateral" during their conversation or that he struggled with M.M. for her purse.

After having intercourse, defendant testified that he rolled back into the passenger seat and pulled his pants back up but did not fasten them. M.M. returned to the driver's seat. She did not put her clothes back on. Instead, defendant claimed that M.M. stated, "I told you that I would pay you," to which he replied, "what makes you think your boyfriend is going to give you some money with me in the car." M.M. then stated that she would get the money and drove naked to the Marathon station without objection from defendant. Defendant claimed that after getting the money at the station, M.M. giggled as she drove away. M.M. then handed $60 to defendant and dropped him off a short time later. Defendant denied apologizing to M.M. for raping her.

Defendant admitted that he initially lied to police about the incident because he was afraid that he would be charged with robbing the gas station. Defendant claimed that he never thought he would be charged with rape because in his mind he had consensual intercourse with M.M.

After hearing all the evidence, the jury convicted defendant on all counts. The convictions on counts II and V of the indictment were vacated based on the doctrine of merger, and defendant was sentenced as indicated. The trial court concluded that the consecutive sentences

imposed on counts I and III were mandatory under section 5—8—4(a) of the Unified Code (730 ILCS 5/5—8—4(a) (West 1994)). The trial court determined that defendant was entitled to 931 days' credit for time spent in custody awaiting trial and sentencing. Relying on *People v. Johnson*, 286 Ill. App. 3d 597 (1997), the trial court applied the credit to each of the sentences on counts I and III, effectively giving defendant an aggregate of 1,862 days' credit toward his combined 15-year sentence. Defendant's motion to reconsider the sentences was denied and this appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant makes two related arguments regarding the sufficiency of the evidence. He first contends that the State failed to prove him guilty of any of the charged offenses beyond a reasonable doubt. Specifically, defendant argues that the State did not prove that he used or threatened to use force in committing the offenses. We find defendant's argument unpersuasive.

The test applied in an appeal challenging a criminal conviction based upon the sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *People v. Schott*, 145 Ill. 2d 188, 203 (1991). This standard of review is one of great deference to the trier of fact; it is not our function to retry the defendant. *People v. Smith*, 177 Ill. 2d 53, 73 (1997). Instead, we defer to the trier of fact on issues of witness credibility, the weight to be accorded testimony, and reasonable inferences to be drawn from the evidence. *People v. Wittenmyer*, 151 Ill. 2d 175, 191 (1992). Defendant's arguments are based entirely upon the credibility of the witnesses.

Both defendant and M.M. testified at trial. Their versions of the events differed significantly. Defendant testified he did not use or threaten to use force at any time. He claims that M.M. initiated the contact and engaged in consensual intercourse with him and voluntarily gave him $60 to "help her get back at her boyfriend." Defendant denied ever possessing a gun on the night in question or even telling M.M. that he had a gun. Defendant denied threatening to shoot M.M. in the back if she tried to escape. Defendant inferred that it was he who was the victim because M.M. threatened to yell "rape" if he did not help her.

In contrast, M.M. testified that defendant initiated the contact by asking her for a ride to his house a few blocks from McDonald's. After initially refusing, M.M. relented and voluntarily let defendant into her

car. According to M.M., once defendant was in the car he directed her to a side street a few blocks from McDonald's. As he was exiting the car he reached for M.M.'s purse in the backseat and said, "Now, I'm going to rip you off." When M.M. insisted that she had no money, defendant apparently reached between his legs and told her that he had a pistol and he needed the money for cocaine. Defendant also threatened to shoot M.M. if she attempted to flee. Neither M.M. nor any other witness ever saw the gun. Nevertheless, M.M. testified that she felt threatened by the statement, so she acceded to wishes of doing something for "collateral." That "collateral" turned out to be sexual intercourse.

While both defendant's and M.M.'s stories are reasonable, it is evident that one or the other was not truthful. Neither story is so improbable as to call its veracity into question. Therefore, the decision about which version to believe rests squarely with the trier of fact—the jury in this case. See *Wittenmyer*, 151 Ill. 2d at 191. After hearing both stories and viewing the witnesses while testifying, the jury chose to believe M.M. over defendant. Because the jury is in a superior position to assess witness credibility, we will not disturb its determination. We affirm defendant's convictions.

■ Defendant's second contention is that even if the evidence was sufficient to prove him guilty of aggravated robbery and unlawful restraint it was not sufficient to prove him guilty of aggravated criminal sexual assault. Defendant maintains that at most he committed criminal sexual assault because neither the victim nor any other witness actually observed defendant in possession of a dangerous weapon. And, according to defendant, section 12—14(a)(1) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12—14(a)(1) (West 1994)) requires the accused to actually possess a dangerous weapon in order to sustain a conviction. This is an issue of statutory construction.

In construing a statute our primary objective is to ascertain and give effect to the intent of the legislature. *People v. Robinson*, 172 Ill. 2d 452, 457 (1996). The most reliable indicator of legislative intent is the plain and ordinary meaning of the language used in the statute. *Robinson*, 172 Ill. 2d at 457. Where the language is clear and unambiguous, the statute must be applied without further aids of statutory construction. *Robinson*, 172 Ill. 2d at 457. Statutory construction is a question of law, so our standard of review is *de novo*. *Robinson*, 172 Ill. 2d at 457.

Defendant argues that the plain language of section 12—14(a)(1) of the Criminal Code reveals that "[a] defendant's mere threat to use a dangerous weapon, when none is observable or otherwise shown to be present, cannot be sufficient to sustain a conviction" (720 ILCS

5/12—14(a)(1) (West 1994)). Section 12—14(a)(1) of the Criminal Code provides that an accused is guilty of aggravated criminal sexual assault if he commits criminal sexual assault and during the commission of the offense:

"(1) the accused displayed, *threatened to use,* or used *a dangerous weapon* or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon." (Emphasis added.) 720 ILCS 5/12—14(a)(1) (West 1994).

We do not read the plain language of section 12—14(a)(1) of the Criminal Code the way defendant proposes. To us the phrase "threatened to use *** a dangerous weapon" means exactly what it says. See *People v. Ramsey*, 147 Ill. App. 3d 1084, 1090 (1986). It does not mean that the weapon has to be displayed while the threat is made. Nor does it mean that the victim or another witness need observe a weapon or that a weapon need be recovered. It simply means that an accused need only threaten to use a dangerous weapon during the commission of the offense, nothing more, nothing less. *Ramsey* supports our conclusion.

In *Ramsey*, three defendants were convicted of aggravated criminal sexual assault. The evidence revealed that during the attack one of the defendants threatened to "blow [the victim's] head off" with a shotgun located in the trunk of the car in which the attack took place. *Ramsey*, 147 Ill. App. 3d at 1090. During the attack, the shotgun was never produced and the victim never saw the gun. After the attack, however, the police recovered a shotgun from the trunk of the car.

On appeal, the defendants argued that, because the victim never saw a weapon and her account of threats was uncorroborated, the evidence was insufficient to establish the required element under section 12—14(a)(1) of the Criminal Code. *Ramsey*, 147 Ill. App. 3d at 1089. The appellate court disagreed and affirmed the defendants' convictions. In reaching its decision the court noted "that section 12—14(a)(1) specifies that the accused need only threaten to use a dangerous weapon under circumstances which would reasonably lead the victim to believe that the object was a dangerous weapon. Such circumstances existed here." *Ramsey*, 147 Ill. App. 3d at 1090. We agree with the State in this case that the fact that the police in *Ramsey* later recovered a shotgun from the trunk of the car was inconsequential to the court's decision to affirm the *Ramsey* defendants' convictions. The key factor in *Ramsey* was the threat by the accused to "blow [the victim's] head off" (*Ramsey*, 147 Ill. App. 3d at 1090) with a shotgun that was never seen by the victim.

We also agree with the State that the cases cited by defendant

(*People v. Skelton*, 83 Ill. 2d 58 (1980), *People v. Guzman*, 276 Ill. App. 3d 750 (1995), *People v. Davis*, 227 Ill. App. 3d 476 (1992), *People v. Charles*, 217 Ill. App. 3d 509 (1991), and *People v. Phillips*, 181 Ill. App. 3d 144 (1989)) are distinguishable and not supportive of his argument. In each of those cases the court addressed the issue of whether and when an object can be considered a dangerous weapon, not whether a weapon must actually be possessed or displayed by the accused. Moreover, in *Skelton*, our supreme court addressed the question in the context of the armed robbery statute, which specifically requires proof that the accused "carrie[d] on or about his or her person, or [was] otherwise armed with a dangerous weapon" while committing a robbery (*Skelton*, 83 Ill. 2d at 63, citing Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1994)))—a standard much more stringent than that required under section 12—14(a)(1) of the Criminal Code.

In this case, the jury apparently believed M.M., when she told it that defendant said he had a pistol and he needed the money for cocaine and that he would shoot M.M. in the back if she attempted to flee and did not accede to his wishes. M.M. felt frightened by the threat and thus succumbed to defendant's demands. Any reasonable individual of average intelligence realizes that a pistol is a dangerous weapon. Furthermore, any weapon specifically listed in section 33A—1 of the Criminal Code (720 ILCS 5/33A—1 (West 1994)) is *per se* considered a dangerous weapon. *Charles*, 217 Ill. App. 3d at 512. A handgun is a weapon specifically listed in section 33A—1 of the Criminal Code. 720 ILCS 5/33A—1(b) (West 1994). Therefore, defendant's threat to use the pistol certainly was a "threat[ ] to use *** a dangerous weapon" (720 ILCS 5/12—14(a)(1) (West 1994)), just as was the threat in *Ramsey*. We hold that defendant's threat to use a pistol, even in the absence of a pistol being observed, displayed, produced, or later recovered, is sufficient to sustain his conviction for aggravated criminal sexual assault.

## B. Mandatory Consecutive Sentencing

■ Defendant's next contention is that he is entitled to a new sentencing hearing because the trial court improperly sentenced him under the mandatory consecutive sentencing provision of the Unified Code (730 ILCS 5/5—8—4(a) (West 1994)). We disagree.

In general, section 5—8—4(a) of the Unified Code prohibits consecutive prison sentences for multiple offenses arising out of a single course of conduct during which there was no substantial change in the nature of the criminal objective. 730 ILCS 5/5—8—4(a) (West 1994). However, where one of the convictions was for criminal sexual assault

or aggravated criminal sexual assault (720 ILCS 5/12—13, 12—14 (West 1994)), the imposition of consecutive sentences is mandatory. *People v. Whitney*, 188 Ill. 2d 91, 96 (1999). Mandatory consecutive sentencing is limited to only those instances where the offenses for which defendant is sentenced were committed as part of a single course of conduct. *People v. Bole*, 155 Ill. 2d 188, 198 (1993). When the statutory criteria are met, a trial court has no discretion and is instead required to impose consecutive sentences for those offenses that trigger application of section 5—8—4(a). *Whitney*, 188 Ill. 2d at 97. Moreover, any sentence imposed for a triggering offense must be served prior to, and independent of, any sentence imposed for nontriggering offenses. *Whitney*, 188 Ill. 2d at 97.

In this case, defendant was convicted of aggravated criminal sexual assault, aggravated robbery, and unlawful restraint. The trial court sentenced him to an 11-year prison term for aggravated criminal sexual assault, a 4-year term for aggravated robbery, and a 2-year term for unlawful restraint. The trial court determined that the statutory factors in section 5—8—4(a) of the Unified Code were met and ordered the sentence for aggravated criminal sexual assault to be served consecutively to the sentences for aggravated robbery and unlawful restraint, which were to run concurrently.

Defendant argues that the offenses of which he was convicted were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. According to defendant, the aggravated robbery and aggravated criminal sexual assault were independently motivated, *i.e.*, there was a substantial change in the nature of the criminal objective. Therefore, in defendant's view, the imposition of consecutive sentences was not mandatory.

The resolution of this issue requires us to briefly engage in statutory construction, applying the well-known rules previously stated. See *Robinson*, 172 Ill. 2d at 457. We acknowledge that section 5—8—4(a) of the Unified Code is not a model of legislative drafting. However, by carefully reading the provision's language and applying the plain and ordinary meaning to its terms, the intent of the legislature in enacting the provision can be gleaned.

Section 5—8—4(a) of the Unified Code discusses offenses "committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." Because there is no punctuation in this phrase, we believe that the language "during which there was no substantial change in the nature of the criminal objective" is meant to limit instead of define the language "single course of conduct." Thus, we hold that section 5—8—4(a) ap-

plies only to those offenses committed during a single course of conduct that is guided by an " 'overarching criminal objective.' " See *People v. Kagan*, 283 Ill. App. 3d 212, 220 (1996), quoting *People v. Fritz*, 225 Ill. App. 3d 624, 629 (1992). In other words, if the acts constituting the course of conduct were independently motivated, section 5—8—4(a) is inapplicable.

Thus, we must determine whether the trial court properly concluded that defendant's actions in this case constituted a single course of conduct. In doing so we must examine whether the motivation to commit the aggravated criminal sexual assault was independent of the motivation to commit the aggravated robbery, or whether both were guided by an "overarching criminal objective."

The term "conduct" is defined in the Criminal Code as "an act or a series of acts, and the accompanying mental state." 720 ILCS 5/2—4 (West 1994). A "course of conduct" is not necessarily confined to a single incident but may encompass a range of activity. *Bole*, 155 Ill. 2d at 193. The term "objective" means "something toward which effort is directed." Webster's Third New International Dictionary 1556 (1993). Thus, an "overarching objective" is a broad goal toward which individual acts are directed.

Because the determination of whether a defendant's actions constituted a single course of conduct is a question of fact (*People v. Edwards*, 259 Ill. App. 3d 151, 156 (1994)), we will defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence. *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999). So long as the trial court's conclusion is supported by the record, *i.e.*, not unreasonable or arbitrary, we will not reverse its decision. *Jordan v. National Steel Corp.*, 183 Ill. 2d 448, 456 (1998); see also *Kagan*, 283 Ill. App. 3d at 220.

In this case, the record establishes that the robbery, sexual assault, and detention of M.M. were all part of an overarching criminal objective. M.M. testified that, when defendant discovered she had little money on her and that they would have to go to the Marathon station to get more money, he demanded "collateral" so she would not attempt to run from the car while they were at the station. The "collateral" defendant wanted was nonconsensual intercourse. Clearly, defendant sexually assaulted M.M. as part of his overarching plan to obtain money from her. Defendant initially attempted to rob M.M. as he exited her car the first time, but the robbery was not completed until he and M.M. arrived at the Marathon station, well after he forced M.M. to have sex with him. Robbery was undoubtedly the overarching criminal objective. Based on these circumstances, we find that the

trial court's determination that defendant's actions were committed as part of a single course of conduct that was guided by an overarching criminal objective—robbery of M.M.—was not against the manifest weight of the evidence.

Both *People v. Tigner*, 194 Ill. App. 3d 600 (1990), and *People v. Laboy*, 227 Ill. App. 3d 654 (1992), cited in support of defendant's argument, are distinguishable from our case. First, both *Tigner* and *Laboy* were decided when section 5—8—4(a) did not mandate consecutive sentencing when a sex offense was committed. Second, both cases are factually different from our case.

In *Tigner*, the defendant was convicted of criminal sexual assault and robbery. The evidence revealed that the defendant forced the victim into an abandoned building and sexually assaulted her. Not until after the defendant completed sexually assaulting the victim did he decide to rob her. The trial court sentenced the defendant to consecutive prison terms, and he appealed. The appellate court held that the offenses were not committed during a single course of conduct because they were separate acts borne from independent motivations. *Tigner*, 194 Ill. App. 3d at 610.

In *Laboy*, the defendant was convicted of attempted aggravated criminal sexual assault and was sentenced to consecutive prison terms. The evidence revealed that the defendant first approached the victims with a gun and demanded money from them. The defendant became angry upon discovering that the couple had no money, and he ripped a gold chain off the female victim's neck. After completing the robbery, the defendant then decided to abduct the female victim and attempted to sexually assault her at gunpoint. The trial court found that the offenses were separate and distinct, and the appellate court affirmed. *Laboy*, 227 Ill. App. 3d at 665-66.

In this case, unlike *Tigner* and *Laboy*, defendant sexually assaulted M.M. as part of his scheme to obtain money from her. His acts were not separate and distinct from one another. Since defendant was convicted of multiple offenses, one of which was aggravated criminal sexual assault, and the offenses were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, we hold that consecutive sentences were mandatory under section 5—8—4(a) of the Unified Code.

## C. Sentence Credit

Defendant next contends that, because the trial court erroneously believed that credit for time served applied independently to all sentences, he is entitled to a new sentencing hearing because the "aggregate sentence turns out to have been shortened substantially less than

the trial court believed would be the case." Boiled down to its simplest terms, defendant's contention is that the trial court relied on an improper factor that affected the length of the sentence imposed. We find defendant's argument wholly unpersuasive.

Defendant's argument in this case is very similar to the argument made by the State in the recent case of *People v. Bashaw*, 304 Ill. App. 3d 257 (1999). In that case, the defendant was sentenced to a nonextended term of 60 years' imprisonment following his conviction for first-degree murder. The trial court stated that the sentence was subject to the truth-in-sentencing law then in effect (730 ILCS 5/3—6—3(a)(2)(i) (West 1996)) and the defendant would therefore not be eligible for day-for-day good-conduct credit. The defendant appealed, arguing that he was entitled to day-for-day credit because the truth-in-sentencing law had been declared unconstitutional. On appeal, the State argued that the case should be remanded for a new sentencing hearing because, among other things, "the trial court would likely have imposed a longer term of imprisonment had the truth-in-sentencing law not been applicable." This court rejected the State's argument. *Bashaw*, 304 Ill. App. 3d at 259. In so doing, we noted that, in *People v. Reedy*, 186 Ill. 2d 1 (1999), our supreme court explained:

> " 'Although the good-conduct credit scheme which may have been considered by the sentencing courts was invalid, the sentences imposed against defendants were, nevertheless, proper. Furthermore, it would be sheer speculation on our part to surmise the extent to which each sentencing court has ultimately factored in the truth-in-sentencing law's good-conduct credit scheme in imposing each sentence against every defendant before it. Consequently, we find no justification for disturbing any statutorily sound sentence imposed against any defendant under the void truth-in-sentencing law.' " *Bashaw*, 304 Ill. App. 3d at 259, quoting *Reedy*, 186 Ill. 2d at 16-17.

■ Here, the trial court imposed prison terms of 11 years for aggravated criminal sexual assault, 4 years for the aggravated robbery, and 2 years for unlawful restraint. Each sentence was well within the statutorily permissible range. Therefore, we adopt the same reasoning used in *Reedy* in this case, and we reject defendant's argument. We also note with interest that defendant did not receive any credit when he was initially sentenced. It was not until after defense counsel requested sentence credit upon his motion to reconsider that the trial court awarded credit. This indicates to us that the trial court placed no emphasis at all on the amount of credit to which defendant was entitled when it sentenced defendant.

Moreover, because aggravated criminal sexual assault is a trigger-

ing offense under section 5—8—4(a) of the Unified Code, the trial court in this case ordered the 11- and 4-year terms to run consecutively and the 2-year term to run concurrently. Thus, defendant was effectively sentenced to a 15-year prison term (see 730 ILCS 5/5—8—4(e)(4) (West 1994) (providing that consecutive terms are to be treated as a single term of imprisonment).

The trial court also determined that defendant was entitled to 931 days' credit for time spent in custody awaiting trial and sentencing. Relying on *People v. Johnson*, 286 Ill. App. 3d 597 (1997), the trial court applied the credit independently to each of the sentences, effectively giving defendant a total of 1,862 days' credit toward his 15-year sentence. This sentence credit calculation was erroneous. See *People v. Latona*, 184 Ill. 2d 260, 271-72 (1998) (overruling *Johnson* and holding that an offender receiving consecutive sentences should be given credit only once for actual days served prior to conviction and sentencing); see also 730 ILCS 5/5—8—4(4) (West 1994) (specifying that an offender should receive credit against "the aggregate *** term of imprisonment for all time served" prior to conviction and sentencing). Hence, we remand this cause for the trial court to amend the mittimus to reflect the proper credit to which defendant is entitled pursuant to *Latona*.

### D. The Unlawful Restraint Count

■ Finally, defendant argues that his conviction of and sentence for unlawful restraint must be vacated because the way it was charged made it, in effect, a lesser included offense to aggravated criminal sexual assault. The State concedes error, and we accept its concession.

Here, defendant was convicted of aggravated criminal sexual assault, aggravated robbery, and unlawful restraint. A person is guilty of unlawful restraint when "he knowingly without legal authority detains another." 720 ILCS 5/10—3 (West 1994). The unlawful restraint count in this case charged that defendant entered M.M.'s vehicle, stated that he had a gun, and sexually assaulted her. Thus, the detention charged in this case was the same conduct inherent in every case of criminal sexual assault, that being the use of force to detain the victim in order to effectuate the sexual act. Because the detention was not charged independently of the sexual assault, it cannot be punished as such. See *People v. Bowen*, 241 Ill. App. 3d 608, 628 (1993); see also *People v. Young*, 115 Ill. App. 3d 455, 469 (1983). Defendant's conviction of and sentence for unlawful restraint are therefore vacated.

### III. CONCLUSION

For the foregoing reasons, defendant's convictions of and sentences for aggravated criminal sexual assault and aggravated robbery

are affirmed, and his conviction of and sentence for unlawful restraint are vacated. The cause is remanded to the circuit court of Kane County with directions to amend the mittimus to reflect the proper credit to which defendant is entitled for time spent in custody prior to conviction and sentencing.

Affirmed in part and vacated in part; remanded with directions.

McLAREN and COLWELL, JJ., concur.